972 A.2d 449 (2009)
407 N.J. Super. 598
WARREN HOSPITAL, Appellant,
v.
NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DIVISION OF MENTAL HEALTH SERVICES, Respondent.
DOCKET NO. A-1261-07T2.
Superior Court of New Jersey, Appellate Division.
Submitted April 29, 2009.
Decided June 17, 2009.
*451 Reed Smith LLP, attorneys for appellant (Murray J. Klein, of counsel; Mr. Klein and David E. Dopf, Princeton, on the brief).
Anne Milgram, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Rachana R. Munshi, Deputy Attorney General, on the brief).
Before Judges CUFF, C.L. MINIMAN and BAXTER.
The opinion of the court was delivered by
BAXTER, J.A.D.
Warren Hospital (Hospital) appeals from a September 28, 2007 final agency decision of the New Jersey Department of Human Services (DHS), Division of Mental Health Services (Division), which granted the request of the Family Guidance Center (the Guidance Center) for a psychiatric screening center location waiver, pursuant to N.J.A.C. 10:31-1.4, for July 1, 2005 through June 30, 2006.[1] The challenged location waiver enabled the Guidance Center, which provides mobile screening services and screening assessments at the two Warren County hospitals, to be designated as the screening center for Warren County even though the Guidance Center's own physical location was not a hospital.[2] Although the Guidance Center's own offices are located in an office building, it conducts all of its screening services and screening assessments at a hospital.
We conclude that the involuntary psychiatric commitment law, N.J.S.A. 30:4-27.1 *452 to -27.23, does not require the designated screening center that conducts psychiatric screening services to be located in a hospital, so long as the statutorily required psychiatric assessment is accomplished in a setting where screening center staff can explore whether involuntary psychiatric commitment is actually necessary. Despite the absence of a statutory requirement, DHS promulgated a regulation requiring screening services to be "physically located in a hospital," and be "either directly operated by or formally affiliated by written agreement with said hospital." N.J.A.C. 10:31-6.1(b). DHS also adopted a regulation, N.J.A.C. 10:31-1.4, allowing waiver of this location requirement.
On review, we conclude that the September 28, 2007 location waiver issued to the Guidance Centerwhich exempted the Guidance Center from complying with a Division regulation requiring screening centers to be located in a hospitalwas the result of a comprehensive and thoughtful analysis of the relevant clinical and programmatic regulatory criteria, and is not violative of the involuntary commitment statutes. Because the statutes governing screening services do not obligate a designated screening center to be physically located in a hospital, issuance of the location waiver constituted valid agency action, and was neither arbitrary nor capricious. We affirm.[3]

I.
The Guidance Center, as a designated psychiatric screening center, has provided screening and mental health services to Warren County residents since 1988. Between 1988 and 2001, the Guidance Center operated outside of a hospital setting; however, in 2001, as a result of the Guidance Center's one-year affiliation agreement with the Hospital, the Guidance Center operated from a physical location in the Hospital, where the Guidance Center conducted all of its screening services in the emergency room. This arrangement lasted until 2004, when the relationship between the two began to deteriorate.
In particular, the Guidance Center objected to the following conditions that the Hospital imposed for the Guidance Center's continued physical location in the Hospital's emergency room: Guidance Center psychiatrists would be required to treat Guidance Center patients who were admitted to the hospital's inpatient psychiatric unit; Guidance Center psychiatrists would be responsible for accepting emergency room calls on a rotating basis in the same manner as the Hospital's staff psychiatrists; the Guidance Center's supervisor would be required to remain on site at all times, or be on site within forty-five minutes of a request from the Hospital, to supervise Guidance Center screeners twenty-four hours a day, seven days a week; and the Guidance Center would be required to provide "crisis companions and counseling services on site at the Hospital's emergency room."
The Guidance Center asserted that these conditions were not mandated by the screening center regulations, and would add between $404,000 and $494,000 to its operating costs each year. Apart from the issue of funding, the Guidance Center particularly objected to one condition: the Hospital reserved the right at its discretion to terminate the operating agreement with the Guidance Center if any of those conditions were not met or remedied within a thirty-day period.
*453 Pursuant to a request from the Warren County Mental Health Board (the Board), which sought to resolve the dispute between the Hospital and the Guidance Center, the Division, on December 13, 2004, conducted a "one-day focused site review" of the Guidance Center's performance of its screening services at the Hospital. The Division found no violations of the applicable screening center regulations. In fact, the Division commended the Guidance Center, noting that the review team was "particularly impressed with the screening assessments[.]" Nonetheless, the Hospital and Guidance Center were unable to reach an agreement. As a result, the Guidance Center left the Hospital in 2005, and the affiliation agreement was not renewed.
After the Guidance Center departed, the Warren County Prosecutor issued a July 6, 2005 memorandum entitled "Mental Health Screening Procedures" that was circulated to law enforcement authorities throughout the area, as well as to representatives of the Guidance Center, the Hospital, Hackettstown Hospital, the Division, and the Board. The memorandum directed police to contact the Guidance Center whenever, based on an officer's personal observation, a person was believed to be in need of involuntary commitment. The memorandum further directed police to contact the Guidance Center and the closet hospital emergency room, then transport such person to that emergency room, where the Guidance Center screener would be waiting or arrive soon after to conduct the screening assessment.
Once the Guidance Center terminated its relationship with the Hospital in the early part of 2005, it sought a location waiver, which was granted on August 3, 2005. The Hospital appealed the grant of that location waiver. On March 6, 2007, we reversed the Division's decision and remanded the location waiver to the Division, due to the Division's "failure to comply with the notice provision contained in [N.J.A.C. 10:31-1.4(b)]," and because, contrary to N.J.A.C. 10:31-1.4(a), the record was "devoid of any finding by the Division that it was `satisfied' that the grant of the facilities' waiver pose[d] no threat to the safety and welfare of the Warren County residents." Warren Hosp. v. N.J. Dep't of Human Servs., Div. of Mental Health Servs., No. A-0209-05, 2007 WL 654406 (App.Div. March 6, 2007) (slip op. at 10) (quoting N.J.A.C. 10:31-1.4(a)). We ordered the Division "to reconsider the [Guidance Center's] application for a waiver from the facilities' requirement on notice to all appropriate parties[.]" Id. at 11. We did not address the substantive arguments asserted by the Hospital. Ibid.
After the remand, the record reflects that the Guidance Center and the Division complied with all applicable notice requirements of N.J.A.C. 10:31-1.4(b). Specifically, on March 28, 2007, the Guidance Center resubmitted its 2005 application for a location waiver, stating that it would be physically located at 540 Marshall Street in Phillipsburg, which is "a few blocks from [the Hospital] and approximately 35 minutes from Hackettstown Community Medical Center." The Guidance Center notified twenty-nine interested parties, including the Hospital, of the waiver application and the opportunity for public comment at the May 15, 2007 meeting of the Board.
In its application, the Guidance Center asserted the waiver would not interfere with its ability to provide screening services in Warren County because it would: (1) "continue to operate its 24/7 crisis hotline telephone service to respond to any and all consumer calls for [screening] needs"; (2) "continue to operate its 24/7 mobile outreach response services to provide screening services to consumers and *454 their families at any location throughout Warren County"; and (3) ensure that "certified screening clinicians and psychiatrists... respond to all calls from [the] Hospital, Hackettstown Community Medical Center and Warren County Correctional Center staff to provide onsite [screening] to consumers in need of such services." The Guidance Center was "cautiously optimistic" that it could work out a new affiliation relationship with the Hospital or other organizations as a long-term solution to its waiver request.
On April 27, 2007, the Hospital submitted comments in opposition to the waiver request. The Guidance Center's request for a location waiver was discussed at the Board's May 15, 2007 meeting. Representatives from the Hospital failed to attend; however, its comments as well as comments from other organizations were distributed. Other than the Hospital, all of the commenters supported the location waiver. In particular, the Board noted that Bridgeway Rehabilitation Services, Hackettstown Community Hospital, Easter Seals, and the Warren Hills Regional School District all supported the requested location waiver. A letter from an absent Board member, Charles Stackhouse, expressed his conclusion that the Guidance Center "convincingly met the criteria for approval" of the waiver. The Warden of Warren Correctional Facility reported that his staff was satisfied with the quality of the Guidance Center's screening services at his facility; similar public commentary from Better Future Self-Help Center clients, Catholic Charities and mental health consumers all expressed support for the waiver. Because representatives of the Hospital did not attend the meeting, and the Board was concerned about its role in approving an expired 2005 waiver application, it decided not to comment on the Guidance Center's 2005 location waiver application.
On September 28, 2007, the Division issued the decision that is the subject of this appeal, granting the Guidance Center's 2005 location waiver request for Fiscal Year 2006, which comprised the period of July 31, 2005 to June 30, 2006. In so doing, the Division considered the Hospital's comments, the Guidance Center's response, the minutes of the May 15, 2007 Board meeting as well as the documents that were presented there, the minutes of the Systems Review Committee meetings from July 25, 2006 through September 25, 2007, and Governor Codey's 2005 Task Force Report.
As it was required to do by N.J.A.C. 10:31-1.4(a), the Division analyzed the applicable regulatory law and determined that the Guidance Center had demonstrated an inability to comply with the regulatory requirement that a screening center be located in a hospital, N.J.A.C. 10:31-6.1(b), and had also demonstrated that the contract funding available from the Division was not sufficient to enable the Guidance Center to comply with the location requirement imposed by N.J.A.C. 10:31-6.1(b).
The Division also determined that: compliance with the waived rule was not mandated by any provision of the screening statute, including N.J.S.A. 30:4-27.5, because "rather than [prescribe] a physical location, the statute emphasizes the importance of providing screening services"; the waiver would not cause a significant risk to the welfare and safety of individuals subject to screening services or the designated screening service staff or emergency services; the screening services provided by the Guidance Center were of a high quality and satisfied all clinical requirements of the applicable regulations; the Guidance Center would be better able to provide quality services as a result of "the *455 waiver to operate as a mobile service;" and "at least 40% of the screening services throughout the [S]tate are operated and administered by separate entities [that are] not part of the [affiliated hospitals'] administration."
The Division made these additional findings: none of the Guidance Center's screening services are conducted at the Guidance Center's office; all of its screening assessments are conducted in a hospital emergency room, either at Warren Hospital or at Hackettstown Hospital; other than Warren Hospital, no agency or other service provider has ever complained about the location of the screening services the Guidance Center provides, or the timeliness of its response to requests for screening assessments; each of the numerous commenters urged the Division to grant the location waiver; the Division's own on-site assessment of the Guidance Center's performance after it left the Hospital demonstrated that the Guidance Center was performing its clinical functions in a manner consistent with applicable statutes; and the Hospital had presented no evidence, other than isolated "anecdotal" incidents, to demonstrate that the location waiver had ever caused any "gaps in control and supervision" that would jeopardize patient safety.
The Division summarized its findings concerning the Guidance Center's manner of operation in the following positive terms:
In this instance the mental health system in Warren County has two E[mergency] R[oom]s which provide access to the mental health system through one point of entrythe designated screening service, [the Guidance Center]. This service provides uniform protocols for purposes of providing assessments to those individuals in psychiatric crisis to enable the appropriate and least restrictive services to be accessed as required by the civil commitment statutes and regulations. That process is being executed by [the Guidance Center] in a cohesive manner, though outside of a hospital setting. The hospital setting is provided through the local E[mergency] R[oom]s but is not at present part of a formal affiliation agreement ... The plan presented by [the Guidance Center] provides a means and process for appropriate evaluation for psychiatric services and the E[mergency] R[oom] centers in the hospitals provide the medical clearing. The process has defined roles which are coordinated through relationships and defined system checks....
....
[A]ssessments are being professionally performed by experienced and trained screeners. In the event less restrictive alternatives other than involuntary commitment are indicated after screening is completed, [the Guidance Center] is capable of delivering patients appropriately to services for their needs; and ... the medical clearance function[,] assuming involuntary commitment is indicated and recommended[,] is performed in the emergency rooms of the two hospitals in Warren County.
....
Additionally, by permitting the waiver to operate as a mobile service, [the Guidance Center] will be better able to provide quality service to Warren County residents. As the letter of Jan Moffet of the Hacket[t]stown Hospital discussed, the availability of screeners directly at Hackettstown Hospital makes it easier for patients and their families since there is no movement from one hospital to another. This protects the welfare and safety of individuals requiring screening services.

*456 As noted herein above, none of the waived regulatory provisions are statutory mandates. In addition, the record indicates that [the Guidance Center] has successfully provided screening services consistent with the statutory purpose[,] and without harm to public welfare and safety[,] operating as a mobile unit capable o[f] reaching the appropriate E[mergency] R[oom] unit and other sites throughout the county, as necessary.
On appeal, the Hospital asserts: 1) the Division's decision to grant the location waiver was per se arbitrary and unreasonable because the decision violates the statutory mandate that the screening center be a physical location where individuals can receive an assessment; 2) the Division's decision to issue the location waiver contravenes the express provisions of the screening regulations because the regulations require that the screening center be a physical location where individuals can receive an assessment, and the location waiver violates the regulatory mandate of N.J.A.C. 10:31-1.4(a)2 that the provision of screening services in accordance with the purpose and procedures contained in N.J.S.A. 30:4-27.5 must not be compromised; and 3) if the location waiver is reversed, this court has no choice but to nullify the Guidance Center's existing designation as the screening center for Warren County.
The Hospital's principal argument is that the location waiver "permits the ... Guidance Center ..., Warren County's screening service, to operate out of an office building where no patients can be seen or detained, no assessments can be performed, and no treatment can be provided." The Hospital asserts that the Division's decision to issue the waiver "violates the statute." As a result, the Hospital urges us to "overturn the Division's decision and, because the Guidance Center cannot operate without the location waiver, nullify the Guidance Center's screening designation." At the heart of the Hospital's argument is its contention that a screening service cannot be mobile, and must be situated in an actual physical location.

II.
"Courts have a limited role in reviewing the decision of an administrative agency." SSI Med. Servs., Inc. v. State, Dep't of Human Servs., Div. of Med. Assistance and Health Servs., 146 N.J. 614, 620, 685 A.2d 1 (1996). "Ordinarily, reversal is appropriate only if the decision of the agency is arbitrary, capricious or unreasonable, or not supported by substantial credible evidence in the record as a whole." Ibid. The burden of demonstrating arbitrary, capricious or unreasonable action rests upon the party challenging the administrative action. McGowan v. N.J. State Parole Bd., 347 N.J.Super. 544, 563, 790 A.2d 974 (App.Div.2002).
In addition, "[a]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibilities is ordinarily entitled to our deference." Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J.Super. 52, 56, 766 A.2d 312 (App.Div.2001) (quoting In re Appeal by Progressive Cas. Ins. Co., 307 N.J.Super. 93, 102, 704 A.2d 562 (App. Div.1997)). "[C]ourts have but a limited role in reviewing the action of other branches of government," and intervene "only in those rare circumstances in which it is clear that the agency action is inconsistent with its mandate." In re Petitions for Rulemaking, N.J.A.C. 10:82-1.2 and 10:85-4.1, 117 N.J. 311, 325, 566 A.2d 1154 (1989).
However, because "an agency has no expertise to decide purely legal *457 issues ....[,] de novo review is appropriate" in such situations. SSI Med. Servs., supra, 146 N.J. at 621, 685 A.2d 1. Therefore, "[a]lthough we recognize that deference is generally given to an administrative agency charged with interpretation of the law, we are not bound by the agency's legal opinions." Levine v. State, Dep't of Transp., 338 N.J.Super. 28, 32, 768 A.2d 192 (App.Div.2001).
We turn first to the Hospital's argument that the Division is not authorized to permit a screening center and its screening services to operate in a mobile fashion. The Hospital relies on N.J.S.A. 30:4-27.5(a), N.J.S.A. 30:4-27.6, and N.J.S.A. 30:4-27.11a and e in asserting that the Division's location waiver "is a direct violation of the unambiguous provisions of the statute, which require[] that the individual go, or be brought, to the designated screening center for assessment."
We begin our analysis with a discussion of the involuntary commitment scheme, of which the above statutes are a part. In 1987, the Legislature revised the civil commitment laws, concluding that new civil commitment statutes were required to "provide clear standards and procedural safeguards that ensure that only those persons who are dangerous to themselves, to others or to property, are involuntarily committed." N.J.S.A. 30:4-27.1b. To accomplish that objective, the Legislature encouraged each county or service area to "develop a screening service and a short-term care facility [STCF[4]] which will meet the needs for evaluation and acute care treatment of mentally ill persons in the county or service area." N.J.S.A. 20:4-27.1d. A "screening service" is defined as "a public or private ambulatory care service designated by the commissioner,[5] which provides mental health services including assessment, emergency and referral services to persons with mental illness in a specified geographic area." N.J.S.A. 30:4-27.2(z). The Legislature envisioned that such screening services would serve as the "public mental health system's entry point." N.J.S.A. 30:4-27.1d. The Legislature directed the Commissioner to promulgate regulations to ensure that a screening service and its staff effectuate the following purpose:
a. A screening service shall serve as the facility in the public mental health care treatment system wherein a person believed to be in need of commitment to a short-term care, psychiatric facility or special psychiatric hospital undergoes an assessment to determine what mental health services are appropriate for the person and where those services may be appropriately provided.

[N.J.S.A. 30:4-27.5a (emphasis added).]
As the entry point, screening services were intended to provide "accessible crisis intervention, evaluation and referral services to mentally ill persons in the community" and "alternatives to inpatient care... and when necessary, to provide a means for involuntary commitment." N.J.S.A. 30:4-27.1d. In providing alternatives *458 to inpatient care, screening services and STCFs are designed to "lessen inappropriate hospitalization and reliance on psychiatric institutions," ibid., and afford the opportunity for treatment in the least restrictive setting.
In accomplishing the screening function, mental health screeners are obligated to make "screening outreach visits" if the screener determines, "based on clinically relevant information provided by an individual with personal knowledge of the person subject to screening, that the person may need involuntary commitment and is unwilling or unable to come to the screening service for an assessment." N.J.S.A. 30:4-27.5d. Additionally, police may transport an individual to a screening service if the officer, through personal observation, has "reasonable cause to believe that the person is in need of involuntary commitment[.]" N.J.S.A. 30:4-27.6a.
If the screening center psychiatrist, after conducting a psychiatric assessment, determines that the individual satisfies the standard for involuntary civil commitment by reason of mental illness, is a danger to himself, others or propertythe psychiatrist so certifies on a screening certificate prescribed by the Division. N.J.S.A. 30:4-27.5b, e. At that point, the patient is transferred to an STCF where, if an STCF psychiatrist reaches the same conclusion, the patient is admitted to a public psychiatric hospital or private psychiatric facility under a temporary order of civil commitment. N.J.S.A. 30:4-27.10a.
Pursuant to the statute, the Commissioner "in consultation with the appropriate county mental health board and consistent with the approved county mental health plan," has the power to "designate one or more mental health agencies or facilities in each county or multi-county region in the State as a screening service." N.J.S.A. 30:4-27.4. The Commissioner, in so designating, must "ensure that screening services are accessible to all persons in the State who need these services and that screening service evaluation is the preferred process for entry into [STCFs] or psychiatric facilities so that appropriate consideration is given to less restrictive treatment alternatives." Ibid. As we have observed, the Legislature directed the Commissioner and the Division to promulgate regulations to accomplish those purposes. N.J.S.A. 30:4-27.5.
We turn to an analysis of the statutes upon which the Hospital relies. N.J.S.A. 30:4-27.5a simply specifies that "[a] screening service shall serve as the facility in the mental health care system wherein a [prospective patient] undergoes an assessment..." (Emphasis added). We do not view the use of the term "facility" as imposing a requirement that screening services cannot respond as needed to the locale where the assessment will be performed. Notably, the term "facility" is not separately defined in N.J.S.A. 30:4-27.2, while many other terms are.
For example, in N.J.S.A. 30:4-27.2n, 30:4-27.2o, 30:4-27.2u, and 30:4-27.2bb, respectively, the Legislature chose to provide specific definitions of the terms "[i]nstitution," "[m]ental health agency or facility," "[p]sychiatric facility," and "[s]hort-term care facility." The Legislature defined an "[i]nstitution" as a state or county facility providing care and treatment for persons with developmental disabilities or mental illness, N.J.S.A. 30:4-27.2n; a "[m]ental health agency or facility" as an "entity" that receives public funding to provide mental health services, N.J.S.A. 30:4-27.2o; a "[p]sychiatric facility" as a State or county psychiatric hospital, N.J.S.A. 40:4-27.2u; and a "[s]hort-term care facility" as an "inpatient, community based mental health treatment facility which provides acute care and assessment *459 services" to persons whose mental illness causes them to be dangerous to self, others or property, N.J.S.A. 30:4-27.2bb.
Those four statutes, when read together, and in combination with the definition of a "[s]creening service" as an "ambulatory care service" that provides "mental health assessment, emergency and referral services to persons with mental illness," N.J.S.A. 30:4-27.2z, demonstrate that the Legislature broadly viewed the term "facility" in N.J.S.A. 30:4-27.5a as the locale where assessment services are provided, after which the prospective patient can be transferred, if mentally ill and dangerous, to the appropriate inpatient facility for further care or treatment. Thus, we reject the Hospital's argument that the term "facility" in N.J.S.A. 30:4-27.5, which the Legislature did not define, requires that a screening service operate from a fixed location, rather than as a mobile service that travels to the location where the prospective patient is located.
Contrary to the interpretation of the term "facility" that the Hospital urges us to adopt, the definition of "screening services" in N.J.S.A. 30:4-27.22, as a "public or private ambulatory care service ... [that] provides mental health services" is service-oriented, not location oriented. Other than requiring that such services be provided in a "specified geographic area," ibid., the definition includes no requirement that would pertain to a singular physical location that provides for on site assessments.
Nor do any of the other statutes upon which the Hospital relies support its position. N.J.S.A. 30:4-27.6 merely describes the circumstances under which a police officer is authorized to take a person to a "screening service." (Emphasis added). Similarly, N.J.S.A. 30:4-27.11a sets forth only the legislative findings and declarations pertaining to the rights of prospective patients, while N.J.S.A. 30:4-27.11e specifically delineates such rights during the first twenty-four hours of involuntary assessment provided "as a screening service," how notice of such rights must be posted and the manner in which such rights may be denied. None of these four statutes supports the Hospital's assertion that screening services cannot be mobile.
When the involuntary commitment laws are viewed as a whole, which they must be, DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005), it is clear that the Legislature stopped short of specifying where a designated screening center must be physically located. It is abundantly clear that the Legislature went to great lengths to establish a comprehensive and coordinated system of screening services designed to prevent unnecessary psychiatric hospitalization. Although the Legislature established screening services and short term care facilities as the mechanisms by which that goal would be accomplished, and specified the intervention, evaluation and referral services they are obligated to provide, nowhere in the statutes did the Legislature articulate the actual physical location where such services would be provided.
We see no reason, statutory, regulatory, or otherwise, to engraft onto the involuntary commitment scheme a designated screening center location requirement the Legislature itself chose not to impose. Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 560-62, 964 A.2d 741 (2009). Had the Legislature intended the result the Hospital urges, it would have said so directly. It did not. We will not supply a requirement that the Legislature itself chose not to include. Ibid.
The Hospital's reliance on Fair Oaks Hosp. v. Pocrass, 266 N.J.Super. 140, 628 A.2d 829 (Law Div.1993), is misplaced. In that case, the Law Division found that the patient's involuntary commitment violated *460 the civil commitment statutes because neither avenue for involuntary commitment, referral from a screening service or the obtaining of a court order, was followed. Id. at 146-48, 628 A.2d 829. There, a law enforcement officer transferred an individual to a hospital for screening, but no screening service was contacted, and the Law Division observed that the hospital that evaluated the patient "ha[d] not been designated as a screening service." Id. at 148, 628 A.2d 829. "Thus, ... there was neither compliance with the screening service procedure for commitment nor with the procedure which requires a court order for commitment...." Ibid.
Unlike in Fair Oaks, where the hospital in question had not been designated as a screening center, here, if a Guidance Center screener is not already present at the hospital, a law enforcement officer, who personally has reason to believe that a person is in need of involuntary commitment, immediately contacts the Guidance Center and arranges to meet the screener at the nearest Warren County hospital emergency room, then contacts that emergency room and transports the prospective patient there. Such a process uses a screening service, and is therefore markedly different from what occurred in Fair Oaks.
Consequently, we conclude that nothing in the involuntary civil commitment legislation requires the Division to limit the award of screening center designations only to those providers who are able to offer screening services from a fixed location in a hospital. Rather, the determination of whether the screening services offered by a designated screening center should be mobile, or instead offered at a fixed location, was left by the Legislature to the discretion of the Division.

III.
In addition, the Hospital claims that the issuance of the location waiver was arbitrary and capricious because N.J.A.C. 10:31-6.1(b) requires that screening services be "physically located in a hospital," and the grant of the waiver was unjustified because the Guidance Center failed to demonstrate that it can provide the statutorily mandated screening assessments by using a mobile system.
N.J.A.C. 10:31-1.4 permits the Division to waive any regulatory criteria, so long as the Division is satisfied that "sufficient contract funding from the Division is not available to the designated screening center or emergency service to comply with any rule of [the Program.]" N.J.A.C. 10:31-1.4(a). The waiver regulation also specifies that, in order to waive a screening center regulation, the Division must find that:
1. The rule [from which waiver is sought] is not mandated by any provision of N.J.S.A. 30:4-27.1 et seq.;
2. The provision of screening services in accordance with the purpose and procedures contained in N.J.S.A. 30:4-27.5 would not be compromised if the waiver was granted; and
3. No significant risk to the welfare and safety of individuals subject to screening services or the staff of designated screening centers or emergency services would result from the granting of the waiver.
[N.J.A.C. 10:31-1.4(a)1 through -1.4(a)3.][6]
*461 We have already determined there is no statutory locational requirement for designated screening centers. Therefore, a waiver of the hospital-location regulation, N.J.A.C. 10:31-6.1(b), does not violate any portion of the screening service statute. We now turn to an analysis of whether the grant of the location waiver was otherwise arbitrary or capricious, or unsupported by sufficient credible evidence in the record.
We conclude the record amply supports the Division's conclusion that the waiver could be granted without significant risk to the welfare and safety of individuals subject to screening services, or the staff of designated screening centers or emergency services, and that the granting of the location waiver would not diminish the quality of the screening services being provided. The Division's conclusion is supported by the following facts: (1) the Guidance Center was able to provide safe and secure services while it was located outside of a hospital for the first thirteen years of its existence as a designated screening center; (2) numerous mental health agencies and service providers in Warren County attested to the high quality of the Guidance Center's screening services; and (3) the Division's own on-site monitoring visit yielded an equally favorable assessment.
In addition, the Division thoroughly analyzed the manner in which the Guidance Center provided screening services and concluded that the Guidance Center's system of responding to the emergency room nearest to the patient's original location, and then performing the screening function there, resulted in the same quality of screening as would have been provided had the Guidance Center conducted assessments at a fixed location within a single hospital and, indeed, in some instances the Guidance Center's mobile system was actually preferable because it avoided unnecessary transfers from one hospital to the other.
The record also fully supports the Division's conclusion that no screening is ever conducted at the Guidance Center office in Phillipsburg, that the Guidance Center's screeners and psychiatrists respond in a timely manner to screening requests, that a mobile system such as this has been used successfully in forty percent of the State's catchment areas for years, and that the Guidance Center provided high-quality screening and assessment services that satisfied the goals established by the involuntary civil commitment statutes.
We are also satisfied that the Division's September 28, 2007 decision fully addressed the requirement imposed by N.J.A.C. 10:31-1.4(a) that the party applying for a waiver demonstrate that the funds provided by the Division are insufficient to permit full compliance with the underlying regulation. The record demonstrates that to satisfy the hospital-location regulation, the Guidance Center would have been forced to spend a minimum of $404,000 per year to satisfy the demands imposed by the Hospital in its affiliation agreement. The Hospital's remaining contentions on the funding question lack sufficient merit to warrant extended discussion. R. 2:11-3(e)(1)(D) and (E).
In conclusion, we are satisfied that the Division's September 28, 2007 decision was wholly in accord with governing statutes, was neither arbitrary nor capricious, and is amply supported by substantial credible evidence in the record.
Affirmed.
NOTES
[1] We recognize that because the location waiver issued here expired on June 30, 2006 when the contract in question terminated, the present appeal is moot. However, the statutory construction issue presented on appeal is likely to recur, but tends to evade review because of the relatively short duration of the bid awards. Courts may decide cases that are technically moot when the issue is "of considerable public importance, capable of repetition, yet evading review." N.J. Div. of Youth & Family Servs. v. J.B., 120 N.J. 112, 118-19, 576 A.2d 261 (1990). Accordingly, in light of the important public issue involved, namely the provision of screening services for involuntary psychiatric commitment, we exercise our discretion to consider the issue raised by this appeal.
[2] At different times, the Division also granted location waivers to the Guidance Center for the two successive fiscal years. The Hospital's appeals of those decisions are pending under Nos. A-5969-07 and A-1936-08. Briefs have not yet been submitted.
[3] Also filed today is In re the Division of Mental Health Service's January 11, 2008 Decision to Grant a Telepsychiatry Waiver to the Family Guidance Center of Warren County, No. A2966-07, in which we reverse the agency action under review.
[4] An STCF is an "inpatient community based mental health treatment facility," located in a general hospital or other appropriate health care facility, which upon referral from a screening service, provides acute care and assessment services to individuals found by a screening service to be mentally ill and a danger to self, others or property. N.J.S.A. 30:4-27.2bb. A STCF is authorized to hold a patient against his or her will for no more than seventy-two hours, after which the patient must be released or transferred involuntarily to a state or county psychiatric institution or a private psychiatric hospital. N.J.S.A. 30:4-27.9b and c.
[5] The "commissioner" is the Commissioner of DHS (Commissioner). N.J.S.A. 30:4-27.2d.
[6] The waiver request must be submitted to the Division's regional office, as well as the County Mental Health Board, and is also reviewed by the county Mental Health Board, the Systems Review Committee, and any "locally active, mental health family, consumer and advocacy organizations as determined by the county Mental Health Board." N.J.A.C. 10:31-4.1(b)1.